The Honorable. The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Hidalgo-Maldonado-Pena, Appeal No. 171432. United States v. Juan Rivera-George, Appeal No. 171551. United States v. Carlos Rivera-Alejandro, Appeal No. 1184. United States v. Joel Rivera-Alejandro, Appeal No. 181496. Attorney Brill. Good morning to the Court once again. This is Rachel Brill and I represent Carlos Rivera-Alejandro in this appeal. I'd like to reserve one minute for rebuttal. You may have it. Thank you, Your Honor. And I will be addressing this morning the issues of speedy trial and lengthy trial, which at their heart, I'm sure the Court is aware, are issues of fair trial and due process. And when this Court considers those most fundamental pillars of the conclusion that must be drawn from this process and this trial is that the trial should not have taken more than five years to begin. The trial should not have taken over almost 18 months and 128 trial days to conclude. And by the way, the defendants should not have been sentenced more than two years after that so that they spent almost a decade between indictment and arrest and their sentencing hearings. And that's the conclusion, Your Honor. It's not a question so much of the precise line that this Court needs to draw, only that under any measure, this much, five years, 18 months, 128 days, was too much. I assert in the brief and in the reply brief that the constitutional analysis for both the speedy trial and the lengthy trial arguments should be the framework that was put forth by the Supreme Court in Barker versus Wingo, the very familiar four-pronged framework, the length of the delay or the length of the protraction, the reasons, which this Court has called the focal inquiry for that delay or protraction, the assertion of the right, whether it was asserted, whether the defendants and Alec assert their right, and finally the prejudice, which I think is equally, possibly as important as what the Court has called the focal inquiry, the reasons. The length, Your Honors, has been conceded by the government and must be conceded. It's not only, I mean, I've said the numbers enough times. It's presumptively prejudicial under the Supreme Court precedent in Doggett. There's no doubt that the length has been triggered. Why don't you get to the reasons? There were lots of pre-trial motions that were filed which kept delaying the proceedings and pleas that were being entered, whittling down the large number of co-defendants. Yes, Your Honor has really gone to the heart of what is the real reason and what are the real reasons for this delay and for the protraction of the trial. First and foremost, they weren't caused by the defendant, but the real reasons that this Court has alluded to is that the government, the prosecution, chose to charge this as what we call in shorthand a mega case, a case with dozens of defendants charging general, usually drug conspiracies, sometimes drug conspiracies involving guns, and that's a choice by the prosecution, but we assert, Your Honor. How do we get around Cassis as circuit president? Cassis was one of the first of these mega cases, and I don't think Cassis drew a line. I think Cassis just simply said that these cases take time to litigate, but I want to assert, and we want to assert, Your Honor, that the government can't have it both ways. They can't charge these mega cases and claim that that is a matter of judicial economy and judicial efficiency, that we will have these enormous cases, everybody tried together and charged together and tried together in these enormous cases, and then cry complexity when the process takes too long. Again, the government and the Court can't have it both ways. Ms. Brill, could you help with the chronology? I think we're talking 62 months here from indictment to trial, if I recall correctly. May 8, 2009, indictment, and July 2014, the beginning of trial. Could you just track at what points during the 62 months did your client move to continue, if any? I think my client moved to continue twice. Once in 2010, which is roughly a year after the case began, and I apologize for not knowing the date, but once again in 2011. These were trial settings that the Court put out there when there were numerous defendants still remaining who had not negotiated pleas or otherwise disposed of their cases. Early on, my client moved to continue the case. If I could just add, for the sake of substantial matters of pretrial litigation with respect to the defendants that went to trial, because motions to continue, Your Honor, can be granted by the Court, can be denied by the Court, trial schedules can be adjusted because of them, but this litigation needed to take place, and that was a suppression issue. There were issues involving Joel Rivera Alejandro's counsel. Those were matters that needed to be resolved by the Court. Certainly, however, they didn't take five years and two months to resolve. Did your client ever move to change counsel? My client did not. I think only of the people that went to trial, only Joel Rivera Alejandro did move to change counsel, but again, 55 defendants. Imagine we just had two defendants and one of them moves to continue twice. Should we sort of subtract that time from the 62 months? Well, again, we're not in the Speedy Trial Act circumstance. We're in the Constitution. I understand, but just in thinking, for example, in comparing this case to Casas, which was 41 months. Right. I mean, every case has its own circumstances. In this case, the motions to continue early on could certainly be seen by this Court as reasonable motions. By 2013, two years later, the defendants were asserting their constitutional right to a speedy trial. I want to directly answer your question and say that, as appellate lawyers and all lawyers say, it simply depends on the circumstances of the case. My client's motions for continuance came early on when an enormous amount of discovery needed to be digested. How are we to think, imagine there were just two defendants. What if the other defendant moved to continue? How are we to account for that? Well, again, what are the reasons? If the reasons are to digest the discovery, has enough time been given already to digest the discovery? If the reasons are that there's a scheduling conflict or a trip of some kind, I mean, a serious scheduling conflict, then the trial should be scheduled after the scheduling conflict. And then what about if he switches counsel? What are we to do then? If you have two defendants and one moves to switch counsel and that slows things down by six, seven months? It does slow things down, Your Honor. I mean, I think that certain litigation... How do we account for that in thinking about whether the total time is too long? Well, when the last motion to switch counsel took place years before the trial started and when the last motion to continue took place three years before the trial started, the court needs to say that it's too much. I don't think, and I hear the court possibly asking for a bright line, and I don't think there is a bright line, and I'm not advocating for a bright line, but I am... Ms. Brill, your answer to Judge Kayada discomforts me a bit. I thought one of the primary issues had to do with looking at the government and whether it was acting in bad faith. When you answered Judge Kayada's question about, well, suppose one defendant moves for a continuance, the answer you gave was sort of, well, it depends on whether there was a good reason for that motion, which shifts the focus to an appellate court evaluating whether the defendants have a valid motion. Defendants bring many motions. They may not be obviously meritorious from the outset, but they have a good reason to bring those. So I don't think you've given us a test that is a workable test here. Aren't we better off with a brighter line rule subject to exceptions for abuse by the government of saying, well, yes, if there are only two defendants, yes, you can consider a motion to consider by the other defendant? I'm trying to think structurally about how all of this operates. Well, structurally, we're looking at, in this moment in the argument, we're looking at the reasons for the delay and we're looking at who's causing the delay. And so I think that the district court's handling of a motion, whether it's a motion to continue, a motion to suppress, or any motion, is something that the court needs to look toward. And the district court's mismanagement in this case is something that the court needs to step in and rule upon. Isn't your better argument that there really was no reason for the government to charge over 50 defendants in one case and so subject all of you to the various motions made by different people? Is that your lead argument? I don't, I'm not asking this court at this time to outlaw the mega cases. As I stated in my reply brief, we have 10 to 15 of these kind of cases every year since 2007. Here in this district, in Puerto Rico, I can't speak to the other districts in the survey. And they are routinely handled much more quickly, much more quickly, years more quickly. And so I can't stand here and say that because this court in this case, this district court mismanaged this case that the lead argument is that the circuit should outlaw the mega cases in general. No, how do you think, let's go, you've now identified a third actor, the district court, not the defendant, not the government, the district court. How did the district court mismanage this case? Yes, the district court mismanaged this case in the pre-trial stages and the direct trials. So in the pre-trial stages, the court took an inordinately long time to resolve the two, the basically two substantial pre-trial issues. And then the court took an inordinately long time to actually set the case realistically for trial in a way that brought the case. So she took an inordinately long time to set the case for trial. And yes, I do- Could you be more specific as to what inordinate meant in this case? How long did it take to, how long did it take to decide the motion and how long did it take to set the matter down for trial? The discretion motion took, I think, somewhere between 18 months and two years, 18 months to resolve. And what was that question? Did she set the case for trial? Yes. Well, there are numerous settings. The way that the, no staff conferences, no actual communication with the council, but numerous trial settings that would then be in unity, or defendants assert some sort of a conflict. This happens all the time in these cases that are filed. This happens in files and the cases. Let's go back to your first assertion that the district court took too long to resolve the two key issues from your point of view in the case. What are you measuring from? Are you saying it took 18 months after the last filing or 18 months from the time the first motion was filed? I was in my mind and I confess that I'm not looking at precise the docket right now, I was estimating from the first motion. From when it was filed? I'm sorry, you're breaking up. I'm sorry. From when the motion to suppress first filed. Okay. And how long after all of the filings were in and argument was held before the district court resolved that, the motions to the motion has been subject of a series of suppression hearings, a report and recommendation from the magistrate and the court adopted magistrate's report and recommendations, I think it was three or four months after it was admitted. Okay, thank you. I do want to just bring in, because we've been discussing and the questions have related to the subject of Margaret versus Wayne, but I do also stress the lengthiness of the trial and the result of the lengthiness of the trial. Again, the reasons for the length of the trial, we assert is because of the government cumulative and the court's mismatchment of that cumulative presentation. But also, the prejudice that resulted from the lengthy trial is something that the court should not ignore. The jury was asked 18 months after testimony started to remember what those witnesses said. To discern after 18 months of trial, that was not every day 18 months. Some months had zero trial days, some months had four or seven trial days. Some months had a two-digit number of trial dates, but it was very spotty, the number of days, often weeks, and on two or three occasions, months. On one occasion, the testimony was cut by months. So, the patient could not be in a fair trial process. Did the jury request any readbacks? Very, right before the first, that would be three or four hours before the court did that. I'm sorry, Attorney Brill, the court really can't hear you right now. Could I ask you to mute your video and just try and repeat what you were saying for the last minute or so? Can you hear me now? Yes. Yes. All right. The question was, did the jury ask for any readbacks? About three or four hours before the verdict was admitted by the jury, the jury asked for the transcripts of the four cooperating witnesses. The four cooperating witnesses encompassed 26 trial days of direct and cross-examination. Only five of those days were transcribed. Twenty of those days would have to have been read back by the court reporter. The jury was told that they would have to sit in the courtroom and listen to the readback. They could not get a transcript, and the jury came back with a verdict three or four hours later, having not received any response other than what I just said, that they chose not to listen to any readback. Ms. Brill, I believe that your time is up. Is that right, Clerk? Yes, Judge, we are over. Okay. Thank you. You've reserved your one minute. We'll hear from the next lawyer. Thank you, Attorney Brill. You can mute, and Attorney Rafael Castro-Lang, if you could please unmute your audio and video device, and you have an eight-minute window. Yes, I have. Good morning, Your Honor. Attorney Rafael Castro-Lang, appearing on behalf of Appellant Joel Rivera Alejandro. Your Honor, the first issue that I would like to go into is the several instances that reflected jury bias and the judge's total mishandling of these incidents that warrant a finding of abusive discretion, and the error mainly committed by the judge was her unwillingness to interrogate jurors when some form of interrogation and investigation was warranted, as this Court's presidents require. The first, I remind the Court that jury bias is a structural error that is not susceptible to harmless error analysis. The first instance is Juror 12, who complained to the judge about intimidating looks of Attorney Juan Milanes, who represented Joel, and Jadred Burgos, requesting that the judge stop that. Joel's trial lawyer was an experienced former prosecutor, Juan Milanes, who would have never looked at a juror in an intimidating fashion. This alone demonstrates the juror imagined intimidating looks. And Mr. Castro-Lang, please, we're not going to second-guess the juror's reaction. Your argument sets up a situation where defense counsel can glare at the jury, make them feel uncomfortable, and obtain a mistrial thereafter. There's no possible way the law is going to develop in that direction. So you did have another argument about the failure to interrogate. Why, when this is reported to defense counsel, and defense counsel says, oh gosh, I had no intention of doing any such thing, and I won't, I'll be careful not to have that impression, and that gets reported to the juror, and the juror says, you know, that's fine, I don't have any bias. What further interrogation should have happened? Well, Your Honor, it seems that when a juror manifests that a lawyer, or two lawyers, are looking at her in an intimidating fashion, that certainly creates the possibility that either she has an innate bias, or her perception could create a bias. Mr. Castro-Lang, suppose your experience trial, or suppose you smile pleasantly at the jurors, and one of the jurors sends a note to the judge and says, I really like defendant Joe's counsel, he's got a great smile. Is that a problem? Well, Your Honor, I don't think it's the equivalent of complaining about intimidating looks, Your Honor. Suppose the next day you give an intimidating look, and the juror doesn't like it. I mean, every trial counsel is aware that the jurors are watching everyone, they're trying to make a good impression on them. Sometimes they do, sometimes they don't. But isn't that fundamentally different than some information coming into the jury from outside the trial room? Well, I think the issue is whether she should have inquired, Your Honor. That's the problem, the lack of inquiry. We have that occurring in this situation, then we have a second situation, while the counsel was making closing arguments, the jurors as a whole sent a note requesting from the judge to ensure that defendants on bail and family members did not leave at the same time, so as to avoid encounters which were occurring on a daily basis. Again, this had not occurred at all during the whole trial, which lasted over a year, and at the last minute, when they're going to deliberate, they complain about defendants and family members leaving at the same time. It is interesting to note that that request was not made of the prosecution team. They didn't have a problem with the prosecution team leaving with them, only the defendants. Again, we have an of a complaint on a trial that is about to end, and they're about to deliberate. Shouldn't the judge have asked some simple questions as to what caused this concern, had anything happened? Well, suppose the judge asked the question, the juror said, I've sat here for 12 months and I've listened to how many people this guy has murdered, and the evidence is very compelling, and his compatriots are in the courtroom, and I want to just make sure that we're not left alone with them. So what then? Well, Your Honor, again, in a sense, we're speculating as to what a juror might have said or not said, and that's the problem. Nothing was done. No record development, and that's an easy way of a judge preventing a defendant from being able to establish prejudice. And this court's presidents say that once there's something that is colorable, there's a duty to investigate. Mr. Castro-Lang, can we step back? You would agree, wouldn't you, that the family members and cohorts of the defendants should not be in the presence of the jurors as they are leaving the courtroom? They should avoid all encounters. Isn't that correct? Well, maybe that is something that the judge should state at the beginning of the trial. Isn't that correct? Isn't it an inherent assumption that defense counsel, as well as the prosecution, will make that clear? I would have thought that did not need to be stated. The problem is that the jury brought it on their own while the trial was ending without any incident occurring that would justify, all of a sudden, them saying, we don't want them to leave at the same time we are leaving. So, again, it's a reflection of a possible bias, and all I'm saying is the judge should have inquired further. Then we have, your honor, the incident of the policeman that lied during jury selection did not mention the fact that he, since 2013, was playing twice a week basketball in a court that was located at a police station. So, he had a definite tie with the police, and had he been truthful, he would have either been stricken or disqualified, for sure, by defense counsel. So, his lying prejudice to defense pursuant to French, this case of the first circuit, he should have been disqualified due to his close association and interpersonal relationship with policemen. Accusing a juror of lying, when exactly did he lie, and what lie did he tell? Well, they were asked if they had any relationship with the government, and here's a person that, since 2013, twice a week goes to a police basketball court and plays basketball with them for years, and if it hadn't been for one of the policemen that recognized them and told the court, look, I know this person, it would have never been found out. So, try to stick with my question just a second. So, your answer is that you asked him, do you have any relationship with the government, and he said no, and you're saying it's a lie, because he should have interpreted your question to include, did he play basketball regularly with some people who were police officers? Well, that establishes interpersonal relationships.  Well, the omission, a lie can be an omission, and certainly, it's always asked by the court if there's any relationship that could create some form of bias or favoritism, or you believing policemen more than defense, and certainly, it seems to me that a person that plays basketball for several years, twice a week with the police at their policeman's basketball court establishes grounds he would have been removed had he been honest. Mr. Castro, can you just be a little bit more specific? I mean, was your question, did the juror have a relationship with the government, or was the question, did the juror have a relationship with any police officers? Well... Because it can be interpreted in two different ways, you see. Of course, but the policemen were witnesses in the case, and the question was that if there's anything that would lead you to give the police more credibility than other witnesses, and none of that was answered, and there was clearly a strong tie, and again, I emphasize, had he been truthful, he would have been removed or recused. So there's prejudice there, because a juror that any defense lawyer would have tried to disqualify or remove them as a parent or a challenge would have taken this person out. Then we add to this, again, and the judge, really because he said, oh, I can be unbiased, she accepted that blindly, and it just seems incredulous that that statement would pass muster, taking into account the prejudice that was caused by his not being truthful. When you add to this, your honor, there's three incidents where the defendants complained about the jurors seeing them in shackles. They testified. The government presented no evidence. Then the judge, looking only at videos, where she had to acknowledge that the videos reflected some of the jurors looking at the defendants, she on her own said, well, I deny the motion, and if she admitted, and there was testimony by three defendants that the jurors were looking at them in shackles, it should have at least provoked some form of juror inquiry. Pastor Lang, isn't this the video where, perhaps it's a different video, but I thought the judge looked at the video and said, no, I've looked at it. I've considered the angle sites. I've considered the period of time, and there's no, the jury didn't see this. Well, I disagree, your honor. There were several instances. Isn't that what the trial judge said? Well, she said that even if she had seen them, it had been for a short amount of time, and that did not justify a mistrial. She admitted that on several occasions. Didn't she first say they didn't see it, and then she said, and even if there was some very short sighting, it's not sufficient to cause a mistrial. That's what she stated. Yeah, okay, so what's the clear error as to the first statement? Well, your honor. What's the factual finding? Well, it's a, the problem is that it's not just the way you have presented it, because she did acknowledge that on two occasions, the videos reflected jurors looking at the defendants, okay, so it's not that simple. I mean, let's put it this way. Her statements are contradictory on the record, and once she admits that the video reflected that they were looking at the defendants, although for a very short amount of time, but if you see a defendant shackled for two seconds, it doesn't make that much difference as she had seen them shackled for a minute. She saw the juror saw the defendant shackled, and there's plenty of case law that establishes that that can create prejudice. It's extrajudicial information that is harmful to the defendant and can provoke a mistrial. Again, all I'm saying is the judge have an obligation to make an inquiry, and what we have in this case is that every time with the exception of that one policeman that played basketball, she totally avoided any questioning of the jurors in incidents that should have warranted further investigation, and we believe that that's an abuse of discretion, Your Honor, that warrants reversal. The other issue I would like to discuss is the Northside Communications ruling of the court. It's uncontroverted that the handwritten notes did not qualify for admission as business records under Rule 803-6. The writer of the notes does not know why the employee that was not required to make the notes did so. You're well submissed that in order for the notes to have been considered for the limited non-hearsay purpose to show association, the identity of the writer of the notes must be known, and he must have an association with the persons mentioned in the notes. This can best be gleaned from the cases cited by the government in its brief. In all of the cases they cited, the identity of the person possessing the notes was known. They were all co-conspirators, which under those circumstances would clearly justify a ruling that they were admissible to show association. Since in this case, we don't know who the writer of the notes was, nor what relationship, if any, he had with any of the defendants, the court erred when it held it could be used to show association. What makes it worse is that the prosecutor in closing argument specifically used the names mentioned in the notes arguing to the jury over objection, Your Honor, that they were in fact those defendants on trial. Once she went beyond the statement of association and said, I want you to conclude that the handwritten name by an unknown person, Joelle, is Joelle Rivera Alejandro, she went beyond what was authorized, and that argument was for the truth of the matter. The argument, once she tried to say, conclude these are the same defendants, that means that the notes are being used to establish that they are, in fact, the defendants that are being made. And the admission of these handwritten notes was highly prejudicial, since it directly linked defendants with radio sees with the police. In a case where that was dependent on the credibility of dubious cooperating witness, its admission could have affected the verdict, and certainly on the cumulative error argument that has been raised, is another grain of sand in the case that warrants this court granting a new trial. Okay. Thank you. Thank you. Thank you, Attorney Castro-Lang. If you could mute your audio and video at this time. And, Attorney Tirado, if you could please unmute your audio and video and proceed. Four minutes. Yes, good morning, Your Honors. We presented three issues in our brief. Our second issue was by Castro-Lang, and with John, it's the jury bias matter. Our third issue was submitted by the written arguments, and we will be addressing the first issue, which is a violation of Hidalgo Maldonado's due process rights by Sixth Amendment due process right by disallowing her to cross-examine and confront Miguel Vega Delgado regarding his credibility, reliability, and potential suggestiveness of his in-court identification of Maldonado-Pena. The identity of Maldonado-Pena was a factual question on her guilt or innocence, and considering the record as a whole, limiting the cross-examination was not a harmless error. The cross-examination is not unlimited. However, we submit that the court did not give Maldonado-Pena a reasonable chance to develop the whole picture about Vega Delgado's credibility, veracity, bias, and mobility. It was essential for her defense and fundamental to cross-examine on the matter of a meeting that happened between Maldonado, between Vega and the government. Vega Delgado was the only witness against Maldonado Vega. He's the only one that identifies her. His testimony was uncorroborated, and it was essential for her conviction. And there were two contradictory testimonies of Vega Delgado's about the identity of this woman, or what was spoken about this woman, during his second day of testimony. Vega Delgado was asked by the prosecutors if he remembered who the woman in the porch was, or if he ever came to learn who she was, and his answer was no. It is fundamental that the question with the adverb ever, which means that at any time. That means from the time he saw that woman in the porch until the time he was giving his testimony, and his answer was on the negative. That was on his second day of trial. Then on his fifth day of trial, after the lunch break, he was posed the same questions over counsel's objections, and he identified Maldonado-Pena as the woman in the porch. After that, a counsel learned that just before, or just during the lunch break of his testimony, there had been a meeting between Vega and the prosecutors, and that was brought to the court's attention, and from there on, that was an issue that went throughout all the trials. It is important to note the silence of the government in their arguments about why the prosecutors met with Vega Delgado prior to him giving that testimony during the lunch time, when they had been appraised during the second day of the trial. None of his testimony was during the second day of the trial. They had been appraised, and they could not meet with any witness while they were on the stand. The court ruled that Maldonado-Pena could bring this to the court and could test to the limit his identification. Wrap it up. Wrap it up. Yes, sir. Basically, the court did not allow a counsel to address her identification, even though when he declined and he lied about having met with the prosecutors. Your time is up. Thank you. You're welcome. Thank you, Attorney Tirado. If you could please mute your audio and video. Attorney Olmo, if you could please unmute your audio and video and proceed. Good morning to the honorable court. Once again, representing Juan Rivera George. This issue about Vega Delgado and his meeting with prosecutors, while the prosecutors had their binders with all the photographs and their reports and their trial materials, was very important because during his testimony, Vega Delgado also provided new testimony, never before provided, about Rivera George. This was about the fifth day of his testimony, after he had already identified and testified about many people involved in the conspiracy, not only the defendants of the trial. You have, at the end of the testimony, the prosecutor's meeting with this witness, with their materials. All of a sudden, this witness comes out identifying people that he did not know before. We were not allowed to challenge that testimony with the fact that he met with the prosecutors before the meeting. We believe that to be extremely important. In addition, I wanted to point out that, as to the issue of the jury seeing the defendant's shackle, there is evidence on the courthouse that corroborates the defendant's statement that the jury saw the shackle. Particularly, you can see the CSO moving abruptly and blocking the view that the jury had to the defendants through a window. You can see the court security officer blocking the window. You can also see the United States Marshals Service agent abruptly then moving the defendant away from the side of the jury. Could you specify when during the trial did that occur? This occurred towards the end of the trial. A year and a half into it? I would say about a year and three months. Your position, ultimately, is that once the judge heard that they may have seen some of the defendants in shackles, that you should have inquired towards the end of declaring a mistrial, which would have started the entire trial all over again. Yes. I believe that the important fact is not how many days of trial that the court has already had, but the right of the defendants by being seen in shackles. You don't think the court should consider imbalancing? Starting the trial all over again would exacerbate exactly the type of prejudice that one of your colleagues, Ms. Brill, was talking about at the beginning of this argument, which is the long, pronounced nature of this. Couldn't the court just conclude that even if they saw a year and three months into the trial, one of the defendants in shackles, we're not going to throw out a whole trial over that? Your Honor, definitely. The right to a fair trial goes beyond above everything. You must have a fair trial. At least give them a fair trial. In addition, the cross-examination of other witnesses was also hindered or limited unreasonably by the court, particularly Mr. Ferrer, who was the only witness who provided believable testimony, although- Counsel, that's time. Thank you, Your Honor. We'll take it. Judge Thompson, I think, has a question. Yes, Your Honor. Could you just clarify for me why it took so long? Was it scheduling issues of the attorneys? Why did the case stretch out for so long? It stretched out for so long because from the first witness on, the presentation of evidence was totally cumulative. You have five witnesses testifying about the same incident of finding a seat of a car. I mean, we objected all of those instances. I'm trying to figure out, why was there just a few trial days a month? Was that just scheduling problems for so many attorneys and the court? Well, Your Honor, I couldn't tell you exactly about all of the decisions that the trial court made at this moment. I mean, I cannot answer your question, Your Honor. I'm sorry. Okay, thank you. We're well familiar with the arguments in the brief. Thank you, Counsel. Thank you. At this time, if Attorney Ulma would mute his audio and video. Attorney Lerman, you have a 25-minute argument. Good morning. May it please the court. Dan Lerman for the United States. I'd like to focus just on a few of the issues that were raised here today. I do want to get to the speedy trial issue, which I know it took up a lot of the court's attention. But before that, I wanted to address just a couple of the fair trial arguments that were made here this morning. Could you answer why the trial took so long? Yes, Your Honor. The trial took so long because the court granted about 71 continuances during the trial. Or, I'm sorry, 71 continuances up until a certain point in the trial. It probably granted about 90 or so. Of the 71 that it granted at the time of the motion it filed, 51 of those were for medical reasons. So, Sue Annette, for example, requested a two, two and a half month continuance after complications from a pregnancy. The defendants did not object to that. Multiple instances in which various defendants had to go to the hospital or the prison doctor. Jurors were ill. The judge was ill. There were lots of requests for continuances, and the defendants did not object to any of those cases. So, all of the delays were for legitimate reasons, and the defendants did not object to any of those delays. And so the cases, therefore, just like Munoz-Franco, where the court found no due process violation with respect to the length of trial, in that case it was 15 months, because the defendants did not object, and the defendants themselves were responsible for many of the delays. That's the same case here. The court even denied a couple of defendants' requests for delays. So, for example, defense counsel requested a three-month continuance so that they could attend some sort of dragon boat competition. The district court rejected that. But when a juror was ill, or a juror's child was ill, or a defendant was in the hospital, or a defendant gave birth to a child and had a C-section in a two-month recovery period, the court granted those continuances. Otherwise, as the court said, the case proceeded continuously without interruption for the duration. So that's, I think, to answer Your Honor's questions about the reasons for the length of the trial. And those were the primary reasons for the length of the trial, Your Honor. Otherwise, it did move expeditiously. Joel made a few juror bias arguments, and judicial bias arguments, and prosecutorial misconduct arguments. This court has made clear that when there is a colorable claim of juror bias, the court should then fashion an inquiry to determine whether the event occurred, and determine, if so, whether prejudice occurred. This court affords great discretion to the court's ability to fashion that inquiry. It did so here. So to start with the basketball situation, Your Honor, just to clarify part of the record, it wasn't the officer who brought the matter to the court's attention. It was the juror who brought the matter to the court's attention. He did so when he saw the police officer testify, because that was the first time at which he recognized the police officer. The judge conducted an extensive voir dire. The judge solicited advice from defense counsel, asked them what questions they would ask the juror. He asked the juror questions. And then, even the next day, returned and sua sponte, conducted a separate independent voir dire. He even asked the juror why he did not initially state at voir dire before trial that he knew the police officer. This is an issue that Joel raised. Joel mentioned that the jurors were given a list of witnesses, as is common, I believe, in trials, and he did not identify this witness or any others that he knew. But what the juror said is that he didn't know the guy's name. He said that he couldn't identify him from the witness list because he didn't know his name because he didn't really know him. He knew him casually. He saw him when he played basketball. The court, on voir dire, asked him extensively about whether he saw him socially, whether he saw him outside the games, whether he was at his house, whether he knew his family, whether they had a drink, whether he regarded him as a friend or a social connection. The jurors didn't know to all of that. He didn't know the guy outside the context of his game. And as soon as he saw him, he said he brought the matter to the court's attention. The court conducted an extensive inquiry, and at the end of the day, decided that there was no basis to believe that the juror would be partial. So that was not an abuse of discretion, but I wanted to clarify the record that, A, the juror did not lie to the court, and the court made a finding that the juror did not lie to the himself who brought the matter to the court's attention. And this is typical of how the court, I believe, handled the matter. When a colorable claim came up, the court investigated it. It had discretion to determine how to investigate it and discretion to fashion a remedy, and it did so here. The next matter that Joelle brought up, and I believe one of the other defendants, is the handcuffs. And I wanted to correct the record here as well. Judge Lynch, you are correct that the district court made two findings. First, the district court found, as a matter of fact, that on both occasions, the jurors could not and did not see the defendants in shackles. It did so by reviewing extensive video evidence and photographic evidence. So when Joelle's counsel says that the government didn't introduce any evidence, it did. The parties introduced the evidence, and the court's response, they requested from the Marshall's office surveillance videos from four different cameras on one occasion and literally pieced together the videos to determine whether or not it was physically possible for the jurors to have seen the defendants. The court concluded that it was not physically possible to do so. That was not clear error, and the defendants show no reason why it would be clear error. So I wanted to just sort of make the record clear in that regard because there was a lot of discussion about the court conceding that the jurors saw the defendants. The court did not jurors did not see the defendant. And secondly, I think this goes to Judge Coyote's points, even under the defendant's theory, the jurors at most saw a fleeting glimpse of them in handcuffs. This court has routinely and consistently stated that such fleeting glimpses do not warrant a mistrial. It's not the type of prejudice that so taints the jury that a mistrial is required. So even if the defendants are right about their view of the facts, which again is contrary to the facts expressly found by the district court, that would not be cause for a mistrial here. Adelia's sole argument has to do with her ability to cross-examine the witness Vega Delgado about a meeting that he had with prosecutors. And Adelia says here today that the government offered no explanation for the meeting. And I just wanted to make clear that it did so. The record reflects because the court asked the prosecutors who then informed the court that they went to the door of the room where the witness was, that they did have their, I think they had some papers or a binder in hand. They didn't enter the witness room. And they went there on two occasions to address the witness's health conditions. They wanted to ask him one about a surgery that he had planned and when that was, and they wanted to ask him on another time whether he had eaten lunch because he's a diabetic and they just wanted to make sure that, you know, his health was taken care of. The court credited that testimony and found expressly that there was no indication that the prosecution tampered with the witness's testimony, which is the allegation that the defendants made below. They said that the witness was unable to identify Adelia before the alleged meeting and then was able to identify her afterwards. And therefore they wanted to cross-examine the witness about that meeting in order to show that the prosecutors tampered with testimony. The court made the factual finding that the prosecutors did not tamper with the testimony and none of the defendants dispute that on appeal. Adelia does mention that she wanted to cross-examine the witness about his ability to identify her and why he was able to identify her at one point and not the other. But the court afforded her the opportunity to do just that. She cross-examined the witness extensively about the very question at issue, his allegedly inconsistent testimony about whether or not she or about his identification of her as the woman who sold him crack. That's the very question that she wanted to get at. Why couldn't you identify me? She was allowed to cross-examine him on that. What she wasn't allowed to do is bring up this legal question that was resolved by the court outside the presence of the jury whether or not that the prosecutors engaged in misconduct. It's an extraordinary allegation and it was one that rejected by the court and that was not an abuse of discretion. In any event, any error here was harmless with respect to the limitation on cross-examination. As we explained in our brief, what about the claim that the witness was asked, in fact, if she met with the prosecutors and she said no, which the court then knew was false and defense counts were not allowed to establish that she had just lied on the stand. That's true. I believe that's a claim made by Teo and not Edalia that they wanted to challenge the witness's credibility based upon an alleged inconsistent or false statement. It's not alleged inconsistent. It's flatly false based on the court's what the prosecutors told the judge. I mean, I want to push back a little, your honor, because the court found that it wasn't false because the court found that there was no, needing to speak of because the lawyers didn't enter the room and they didn't discuss anything with respect to the case. But I get your honor's point and I guess I would just say that would have quickly been established at trial if it came up. It would have established that he wasn't lying in substance even if your honor is concerned about whether it technically qualifies as a misstatement or a lie and any error would be harmless because there's no doubt again about Vega Delgado's identification of Teo. There was abundant evidence about Teo from other cooperating witnesses and Teo and the other counsel had the opportunity to cross-examine this witness and others about their veracity. I mean, they did so on several occasions about whether they lied to investigators, whether they lied to cops, whether they sold drugs, where they spent their money. So, the test is whether the court gave the defendants a reasonable opportunity to develop the whole picture in the case and establish the veracity of the defendants as a general matter. And I would say that the court did so here and it wasn't an abuse of discretion to exclude an issue that the court found relied on a mischaracterization of the fact and would have confused the jury. I think that then leads me to the speedy trial argument and I know- Can you talk about the phone record? Oh, I'm sorry, your honor. Sure. The Northside Communications records. Is it correct you have- there's no evidence in the record at all as to who put the handwriting on that document? The evidence shows they have- the owner of the Northside company testifies, a custodian, for purposes of admitting the entire record as a business record. And in his testimony, he said that it was the practice of the employees to write down the names of people associated with phones when they came- either if they called and spoke with the employee or if they came into the office. To directly answer your question, I'm not sure we know the name of the employee who wrote the notes. We might, but I don't particularly recall. And so, I wouldn't want to make any misstatement here. But the point is that the reason for this practice, as testified to by the custodian and business owner here, was lots of times phones or scanners get lost, or do you want to change something or upgrade, and it's useful to the employees to know which ones, you know, related- But the court- the court didn't allow that portion as a business record. That's correct, your honor, and that's the point that I wanted to make. The court expressly denied the government's request to admit it as a business record. The court only allows the handwritten notes- I'm sorry, counsel. I apologize, judges, for interrupting. This is Dan. One of the attorneys who- Rachel Brill, who argued in the beginning of the case, she accidentally left the case and she's coming back in. I just wanted to let you know before we continue. We will- Hello, this is attorney Rachel Brill. I've been off the call for the last three or four minutes. I'm sorry. I've tried- I was trying to text Dan, Mr. Toomey. I'm sorry. You're back now, correct? I can see and hear everybody, yes. The last thing I heard Mr. Lerman say was about the lack of prejudice regarding the quote-unquote lie by Megha Delgado. That's the last- I just heard that entire argument, but I didn't hear anything after that. Okay. Well, Mr. Lerman was next asked to address the business- the telephone record. I asked him to summarize his response and then get to Judge Thompson's comment that the district court did not admit it as a business record. Go ahead, Mr. Lerman. Right. So, since the court didn't admit it as a business record, how was it properly authenticated for any reason? Because we don't know who wrote it. That's right. I'm not sure, Your Honor, that this court's precedents require authentication. So, just to back up, it was admitted to show proof of association and not the truth of the matter asserted. So, that's a non-hearsay purpose. This court has acknowledged that- But it still has to have a requisite foundation for the admissibility. I don't see what the foundation is. Yeah. I mean, the foundation is that it's relevant because if it shows- It's not relevant if we don't know who wrote it and why. I would argue, Your Honor, that that just goes to the weight of the evidence. I mean, I think it was Joelle, but I could be mistaken, who made the point that in other cases it was often one of the co-defendants themselves who either wrote it or it was found in their apartment. It wasn't always the co-defendant who wrote it. But I would argue that that just goes to the weight of the evidence the jury could ascribe to that document. In those other cases, and Hensel is one and Kostas is another, there was no authentication. Nobody said, oh, this co-defendant necessarily wrote that, and we find that those are accurate. What the court said is that it lists a few first names, not last names, and the jury is allowed to make the inference that by virtue of those names being listed together, it could suggest that those people were associated with each other. What did not happen here- But isn't there a critical difference between it being found in the defendant's possession? I mean, I think that the difference that goes to the weight of the evidence, Your Honor, I'm not sure being found in the defendant's possession necessarily tells you anything about who wrote the notes. Here, for example, a notebook was found in the co-conspirators. I don't think I'm giving away anything to say I don't believe it was ever authenticated who wrote those names. It was just by virtue of the fact that those names were there and it listed several of the co-conspirators together using the nicknames that were used throughout the trial, the jury was- Found in the defendant's apartment. That's true, and that is a difference, Your Honor. I can see that that's a difference and that might be relevant to the weight of the evidence, but the principle is that United States v. McIntyre, which is one of the cases we cite in our brief, it in turn summarizes a lot of the case law here and it cites cases allowing proof of association, including, I believe, cases where the out-of-court statement was not made by a co-conspirator. So one case that I'm thinking of is where a letter was just addressed to the four defendants. The court allowed that in. It was just a letter that had the four defendants' names that bleeped together in the address line, and the jury was allowed to infer that those people were related. I don't believe in that case they knew who sent the letter. I could be wrong, but I just wanted to make clear that the principle, the hearsay principle, which is the principle at issue here, whether it should have been admitted over a hearsay objection, just goes to whether or not it was admitted for the truth of the matter, asserted, or for some other purpose. But if Your Honor is concerned, I mean, there's plenty of direct evidence linking the defendants to each other here. There was video and surveillance and eyewitness testimony that literally saw the defendants working together, conducting drug tallies together, dealing drugs together, holding weapons together. There was abundant direct testimonial evidence linking defendants. And there was also other, as I noted, physical evidence. There was a notebook from Teo's apartment that listed some names. So to address Your Honor's concern, that was found in Teo's apartment. There was also the cell phone contact list of the cell phone taken from one of the conspirators, and it listed Teo and several of the other co-defendants here. So to get Your Honor's point, perhaps this evidence is less weighty than some of the other evidence. But when combined with the other physical evidence, it's corroborative. And I would say that when combined with the other evidence at trial, which was overwhelming eyewitness testimony that was corroborated by multiple eyewitnesses, any error in admitting this was harmless. So finally, if I could get to the Speedy Trial Act, if that answer satisfies Your Honor. Sorry, Speedy Trial claim focusing on the defendant's amendment right to a speedy trial. We already addressed the length of the trial itself. With respect to the pretrial indictment, as I believe one of the defendants noted, this court applies the four-factor test from Barker v. Guido, which looks at the length of the delay, the reasons for the delay, the defendant's prompt assertion of his or her speedy trial rights, and any prejudice that ensued. And here, we submit, those factors show that the district court did not abuse its discretion in denying the Speedy Trial claim. As one of the defendants, I believe Carlos mentioned, we do not concede that the trial here was lengthy. But as we mentioned in our brief, this court repeatedly said that, and therefore, it's presumptively prejudicial for purposes of sort of triggering the inquiry. But this court routinely said that length of trial alone is not enough to trigger, to show a violation of the Sixth Amendment. And indeed, the court held that there was no violation after a delay of more than five years. And here, as in that case, the other factors weigh in favor of the government. So the second factor is the reasons for the inquiry. And that is the key inquiry. And as Judge Lynch mentioned earlier, this is not a case in which there was a deliberate attempt by the government to delay trial, or any bad faith by the government, or even negligence by the government. Rather, the delay was justified by legitimate reasons. This was a large multi-defendant case. The defendants here alone filed more than 500 pretrial motions. The defendants who went to trial, I believe, filed almost 40% of those motions. So about 200 of those motions were filed only by these defendants, although this court should look to all 500 motions. And so this is, therefore, just like Casas, where the delay was due in large part to the resolution of pretrial motions concerning the defendants. Let me ask you something about that, because I'm just trying to follow the law. If we keep pursuing that logic, and say 60 months is okay, it seems to say when the government can, when the government brings one of these mega cases, it seems you've got two choices. One is, the court devotes an extraordinary amount of resources to it, so that it moves along in normal course very fast. Or the other choice is, the defendants spend years in jail before ever getting to trial. That's right, Your Honor. And that latter thing is rather unappealing. We presume that people, until they're tried, are innocent. We realize sometimes bail can't be granted, but to sit in jail for 60 months before you even get to be tried, there's got to be something that is very worrisome about that. So why don't we say that if the government insists on grouping together, rather than breaking down into manageable components, if the government really feels they have to do that, then the court system needs to devote some extra magistrates and extra resources, so that people aren't sitting in prison for years without a trial. Why don't we go that way? Well, Your Honor, I mean, you know, I believe the court generally has some discretion to manage. Four minutes remaining, counsel. Sorry, if I can answer, Your Honor. Yes, you have four minutes, and I have some follow-up questions. I understand your concern, Judge Cayeta. As an initial matter, I just want to note that, while this was a large case, the defendants didn't move to sever the case. I mean, let me just make that clear. There were two motions to sever by Joel and Carlos early on. What those were were motions to sever to delay the case. So in Joel's case, I believe it was a 2011 motion to sever. His attorney got ill. He didn't want to go ahead with the scheduled trial date because he wanted his attorney to have time to prepare. He moved to sever just to remove himself so that he could be tried later than the other defendant. He didn't suggest that it was inappropriate to try them together or that it was too big. Carlos filed a motion to sever, I believe in 2014, or very close to before the trial. And again, his argument was he wanted to delay his trial. He said that he was detained stateside. He wanted his lawyer to have sufficient time in Puerto Rico to prepare for the case with his client there, and therefore moved to sever on the ground that he wanted a later trial. So just to sort of address the sort of mega-trial issue here, I just wanted to point out that none of the defendants moved to sever on that ground. And to the extent that they did move to sever, it was usually to delay trial further. And so that there was no indication here that things were not proceeding apace. They did move to, and say the case was taking too long. They filed a speedy trial motion. That's right, Your Honor. They did. But just on the other point, I just want to make clear, though, also just respect for the mega-trial point before addressing the motion that Your Honor raised. I think Judge Linskett-Casas makes clear that there are generally certain efficiencies as a general matter to be gained from trying people together, because there was no objection to that here. And in any event, I just think it would be perverse to allow defendants to sort of create a Sixth Amendment claim by virtue of the fact that they entered into what is unquestionably a large conspiracy. There's no dispute that this was a large conspiracy and that these 55 people were part of the conspiracy. And so I understand that there's a tension there, but there are efficiencies to trying them together. And let's be precise about what you just said. What you just said, to be precise, is that if you are accused of being in a large conspiracy, then you're out of luck and you're going to spend years in jail even before you see a juror. Right. I'm not saying you're out of luck, Your Honor. I'm just saying that the mere fact that it was a large conspiracy is not itself a reason. And that necessitated a lot of pre-trial motions. It's not itself a reason to rule for the defendants and just before getting to their assertion of the rights. Because there was no bad faith here and because it was justified, this court has said that that factor weighs in favor of the government. On the assertion of the rights, Your Honor, they did move for dismissal of the indictment on speedy trial grounds. They did so for the first time in 2013, which was four years after the first indictment. So they waited four years to even mention a speedy trial argument. And in those four years, they filed hundreds and hundreds of motions, including suppression motions, withdrawal motions, and of course, as Judge Lynch mentioned, various plea motions that, you know, as defendants were dropping out throughout the trial. This court had said, moreover, that a defendant's first assertion of his intent to file, to evoke his speedy trial rights shouldn't even come in a motion to dismiss. The defendant should ordinarily show some indication of his or her right to assert those speedy trial rights before they seek to dismiss the indictment. They did not do so here. Their first notice was in a motion to dismiss the indictment. And in any event, that was four years into trial. I mean, sorry, into the pre-trial period. So it was a year before trial that they first filed their notice. Counsel, that's time. No, you're going to keep going. We have more questions for you. But before you say anything more, I'd like to ask Judge Thompson to ask her question so that you can direct your answers more specifically to her concerns. These meta-trials, we have justified by saying that it has built-in efficiency. This obviously is not the case in this particular situation. What I'm trying to figure out is whether this case is an anomaly and that the mega-trials that you usually have are wrapped up in a more speedy fashion. Because once again, it's still the choice of the prosecutor to seek to try everyone in one big trial as opposed to suggesting to the court, well, why don't we do 20 and 20 and 20? Because I would presume that if they were broken up, it would have some more efficiency than what we see here. Yes, Judge, on that last point, and this gets to Judge Kida's type of question as well, I'm not sure it would necessarily be more efficient. I mean, it depends on the judicial resources and whether this is before the same court or not. If you had 20 mini-trials and the defendants were charged, Siri Adam, and assuming they weren't released on bail because as here they presented a threat to the community or a risk of flight, it's not clear to me that that last trial or the last four trials or the last 10 trials would have happened any sooner. And so that is part of the efficiency. There are certain efficiencies to not having the same witnesses testify in 20 different trials about the same thing. So, I mean, I understand your point and I understand that Judge Kida's point is, you know, if we could hire some more magistrates or shuffle things around, but I just want to make clear, it's not clear to me, at least, that that would necessarily move things along any quicker. I didn't say that. I said if it was 20, 20, 20, in other words, 20 instead of 55, you divide them into three, which I think would have three trials. Right. Okay. I think same thing, but less significant. I agree that there may be, I mean, I'm not sure that would necessarily make it happen any quicker either. I mean, then you'd have 200 pre-trial motions in each of those rather than 500 and you still have the trials. It's not clear to me if those trials themselves would have happened any quicker. So you then still have a lengthy trial for each of the steps of the 20 defendants. I'm not sure defendants 40 to 60 would necessarily have started or ended their trial at the same time, but obviously that's hypothetical. I mean, to your honor's question, it is true that the prosecutor did choose to indict this as a 55 defendant case, but, you know, there was no evidence that it did so out of bad faith or to delay the trial or to, you know, prevent defendants from, you know, gathering witnesses or to allow witnesses to or anything like that, or to somehow create a conflict among the defendants. I mean, such things theoretically could arise, but there was no allegation. Well, let's be, you're saying it's reasonable for this trial to have lasted that long because there were 55 people. That's one of your most points you make in your brief. Yeah. Well, so it's, I would think a prosecutor would know that at the beginning, if it was reasonable, so they know they were doing that and they didn't, you know, just wake up this morning and start trying cases, they knew that it put them in a position where they could say the defendants plead now and get four years or prove yourself innocent and spend six years in jail waiting to do that. That's a tremendous leverage for a prosecution and plea negotiation. Well, I'm not sure, your honor, whether all the defendants here were in jail for that period, and I don't want to misrepresent. We know that at least two of the defendants who actually went to trial at the end of the day were out on bond. So I believe some of those 55 defendants were also out of bond during that period. Which two were out on bond? Excuse me? Which two were out on bond? Sue Annette and Adelia were out on bond. Tio, Carlos, and Joelle were detained throughout, but as we noted in that brief, that time was credited to their term of incarceration. I understand that you're still concerned with the pretrial detention here. To Judge Thompson's point, I don't have an answer as to how long these cases take on average and to the extent to which this is an operation. I know Carlos' brief cites a number of large cases that went much quicker than this. The Casas case had 60 defendants and was three and a half years. Munoz-Franco had four defendants and had a five-year pretrial period. So while I would acknowledge that this is a long case, and I don't think this is for the course necessarily, it is not remarkably unusual in that this court has had several cases where you have a three to five to six-year pretrial detention in Munoz-Franco, Casas, and the Carpenter case. I would say that while I understand Your Honor's concern, whether or not this case is sort of an outlier or not, these concerns, which may well be concerns that apply to all large cases generally, is not a basis to find, I believe, a violation of the case here. Because the reasons were justified, there's no indication of bad faith. They didn't assert their Sixth Amendment rights until four years into the thing. And as we all... Counsel, there's some irony in your telling us this is not an aberration, that the government has now routinely, especially in Puerto Rico, brought mega cases. And well, they're mega cases and they take three to five years. As to resources being available to the court system, that's up to Congress. That's not a decision that judges can take to apply more resources. So here we're faced with a situation where, and I will add, the government is entitled to prosecutorial discretion. Any number of cases tell us that courts can't interfere with that. Nonetheless, we are left with this very troubling scenario, which seems to be growing in this circuit. It is not just Puerto Rico. Mega cases have been brought in Massachusetts as well. And Judge Thompson is suggesting, well, maybe there will be some loss of efficiency, but you could have divided this up. There were different drug points involved. That was a sensible way of dividing it, albeit you do charge an overall conspiracy. There are advantages to the government, as Judge Kayada just said, your ability to extract plea bargains. If there had been three trials, well, some of them would perhaps have taken five years, but they would have been sequential and some of them would have come to trial probably a lot faster. So this is a systemic problem. I don't know quite what the answer is, or well, there's obviously no clear answer. And the Barker case did not really involve these choices by the United States to prosecute many, many defendants at once. It is true, as you say, that the nature of the crime involves many, many defendants. But it does sort of strike me that there needs to be some sort of solution to this problem. And maybe it comes from the Department of Justice, some recognition of the fact that many people are going to sit in jail cells for a long time out of these choices to longer sentences if they are convicted. But the Department of Justice is supposed to be concerned about justice, including the Sixth Amendment rights of defendants. So whatever the outcome of this case, I think it would be appropriate for you to convey the sense of unease that all three judges of this court have expressed to you about the situation that is resulting from these mega-trial choices made by the prosecution. I understand Your Honor's concern. I can represent that we will have discussions to address those concerns and determine whether there are ways to address them on the ground. And I just want to add one other concern. I mean, I joke with my folks that I can't remember what I had yesterday for breakfast. We're talking about asking witnesses five years down the road, and that's from the indictment. That's not even from the incidents themselves. We're asking them to remember specific details about what they did years ago. That's true, Your Honor, and I appreciate that concern. This court and the Supreme Court have said that could cut both ways. I don't want to just rely on that, but, you know, fading memories could help or disadvantage a defendant. I'll point out the defendants here, at least with respect to the Sixth Amendment pretrial speed trial claim. Joel doesn't argue, for example, that his defense was prejudiced. He does suggest that he suffered some anxiety during detention, but this court has generally said that general anxiety is not sufficient. So he didn't make a particularized claim that his defense suffered. And as we noticed with respect to the trial itself, this court and others have looked to the fact that when a jury issues a discriminating verdict, you know, acquitting some defendants on some others. It shows at least that the jury was able to handle the case. I understand that Your Honor's question goes to witnesses' recollections and the like, but this was a case of many witnesses. There were, you know, very few cases where the witnesses were unable to recall something when they were that was presented to the jury, and it was something that the jury could consider. I understand the concern, Your Honor, but absent any type of even assertion that they were prejudiced by virtue of something that Your Honor mentions, there's no basis. Counsel, that's a little bit disingenuous. We all know that waiting five years to testify about events, memories are not going to be quite as good. The federal courts do have a concern that we get to the truth of the matters. We believe the adversary system is the best way of getting to the truth of the matters. And as Judge Thompson has said, in addition to the Sixth Amendment rights at issue here, there are sheer concerns about the accuracy of the outcomes in the cases caused by this delay. So, I appreciate that you've said you will convey the message to the Department of Justice. Be sure you include Judge Thompson's point when you do. Yes, Your Honor. What should we do? I mean, imagine tomorrow there's a large conspiracy that involves 60, 70 people. So, there's the rationale that why try this over and over again. We'll try it at once, so you bring one of these cases. And one of the defendants comes forward right at the beginning in the first month and says, look, I'm innocent. I want to be tried. I'm not going to move for any continuances, and I want to get to trial in a year. Please give me some assurance that I'll have my right to freedom adjudicated by a jury within a year. What are we to say? What's the district court, what's the government to do in response to that? What's the district court? Are they to say, well, you're in a mega case. The other parties are probably going to move for continuances. Their attorneys will get sick. Take some time. You're going to, the First Circuit has said you should be prepared to spend five or six years in jail before you see a jury. That can't be the result, can it? I'm not sure it has to be, Your Honor. I mean, the court may well grant that. The government may well not oppose that. It would depend on the facts of the case and that jury's, I mean, sorry, and that defendant's stated reasons for seeking either severance or a quicker trial. But my only point is that they didn't do that here. They didn't move to sever on that ground. They didn't challenge the mega nature of the case at any point in the trial. And they didn't raise the trial issue until four years into the matter. So I understand the concern that may well come up and I can't tell you whether that has, in fact, come up last week or not. But if that did, it would certainly be within the court's discretion to grant the severance and let that defendant proceed at pace. Okay. I think the points have been made. Unless my colleagues have any further questions, I believe you may be at the end of your time. Maybe. Thank you, Your Honor. Just a minute. Any further questions? No. Thank you. Thank you, Mr. Lerman. Thank you. Thank you, Judge. We have Attorney Brill for one minute. Might I suggest that she leaves her video off while she participates? Because she may have a better audio connection if she does that. If she is willing to do that, that's fine with me. All right. Before I start, can everybody hear me? I've unmuted myself, but I left the video on. Yes, Ms. Brill. Thank you. I think the court has engaged in a long and interesting and important discussion about the systemic problem, and Judge Lynch was very clear about the systemic problem, but this particular case raises huge issues as well and huge problems and reversible error. The pretrial litigation period did not move expeditiously. And I said in five or six other MAG cases in this district, which were concluded in half the time, in one-third of the time, I could have chosen five or six other cases from several different judges, not only the judges that are known to move things quickly, but each judge in the court. The jurors that were raised by the defendants could have been handled much more quickly pretrial. The trial did not move expeditiously. There were bench conferences that took hours, several, not just one. There were issues of written orders to write. These written orders are about other routine evidentiary matters. There was cumulative testimony and evidence presented by the government. I urge the court to look at the pretrial and trial matter as a whole and to listen to Judge Hosner's message that the role of courts of appeals in protecting jurors and litigants from excessively protracted criminal trials that constrain the capacity of jurors, and by doing so undermine procedural justice. That concludes argument in this case. Attorneys Brill, Castro, Tirado, Olmo, and Lerman, you should disconnect from the hearing at this time.